## GLOVER v. THE STATE.

SIMMONS, C. J. The evidence being insufficient to establish beyond a reasonable doubt that the accused was the person who committed the crime which was shown to have been perpetrated, the verdict of guilty can not be lawfully upheld. It is as much incumbent upon the State to identify the accused as the perpetrator of the offense, with the requisite degree of certainty, as to prove the corpus delicti..

*Judgment reversed. All the Justices concurring, except Little, J., absent, and* LEWIS, J., dissenting. The evidence, in my opinion, was sufficient to identify the accused as the perpetrator of the crime.

Submitted February 17,—Decided March 10, 1902.

Indictment for burglary. Before Judge Felton. Bibb superior court. January 9, 1902.

*John R. Cooper* and *W. F. Blue,* for plaintiff in error, cited: 26 *Ga.* 637; 29 *Ga.* 594; 34 *Ga.* 342; 50 *Ga.* 513; 85 *Ga.* 535; 86 *Ga.* 355; 92 *Ga.* 578; 95 *Ga.* 457; 111 *Ga.* 140; 113 *Ga.* 721; 1 Greenleaf, Ev. 13; 3 Id. 29.

*William Brunson, solicitor-general,* contra.

LEWIS, J. At the November term, 1901, of Bibb superior court, Glover was brought to trial upon an indictment charging him with the offense of burglary. The jury returned a verdict of guilty, and he thereupon made a motion for a new trial, which was overruled, and he excepted. The controlling question in the case is whether or not the evidence upon which the State relied for a conviction was sufficient to sustain the jury's finding. Four of the members of this court entertain the view that it was not, while I am of the contrary opinion. It was shown at the trial that, as charged in the indictment, the house of L. A. Braswell had, on the morning of the 24th of October, 1901, been burglariously entered and the sum of two dollars and a quarter in silver money taken therefrom. The only question really at issue was whether or not the accused was the person who had committed the offense. The State introduced as a witness Mrs. Braswell, who testified, in substance, as follows: Some one entered the house through a window in my room. The opening of the window did not awake me, but I woke apparently out of a sound sleep, the light being out first attracting my attention. My little one was very sick with the croup, and I decided that I would get up and give him some medicine. I thought Mr. Braswell had blown out the lamp. It was in one corner of my room, opposite

my bed, on the dresser. I had to go by the bed to the dresser. The matches were under my pillow at my head, and I struck one just as I got off the bed. I stepped on something, and when I did I knew-it was some one. I discovered it was some one lying right at the foot of my bed, and I looked to see if it was any one who belonged to the house. "He pulled my dress from over the foot of my bed and wrapped up his head so that I could not see his face and hands, but I think he was a very chunky negro, and I have always believed he [the accused] was the negro, from the description and the way he was lying. I did not see his hands. I saw his clothing good. I think I could identify that clothing. I think he is the negro. I believe I would be willing to swear they are the same clothing. They were checked pants. I could not exactly say, but they looked very much like the clothes he has on. . . I stepped on him at the same time I struck a match. I lit the lamp and was screaming all the time. I saw him get out of the window. He lay right there till I lit the lamp. He had his head wrapped up in one of my dresses. I saw him from his chest down. I saw his clothes and pants and socks good. He had on a pair of new looking socks, very dusty, and the print of his shoes on them. He didn't have on any shoes." I stopped and looked at him while I had the match in my hand. I do not think I struck but one. "The negro went out the window he came through. He carried my skirt with him and threw it back as he went out of the window." This occurred about half past twelve or one o'clock.

It appeared from the testimony of Braswell that, being awakened by the screams of his wife, he ran from the room which he was occupying into her room in order to find out what was the matter, but was not in time to see the alleged burglar. After daylight, however, he made an examination of the premises for the purpose of finding tracks, and discovered the track of a man who "was in his sock feet." This track led out in the direction of Mr. Hudson's, a neighbor, and was followed for fifty yards and then lost, owing to the fact that, from that point on, the ground was so hard that no impression of footprints upon it was discernible. Hudson's house had also been broken into, and he and Braswell followed a track which led from there down a road, the footprints being such as to indicate that the person making them was running at the time. The accused was suspected of being the guilty party,

and they then went to a store where he was employed, and Braswell "asked him to come outside and pull off his shoe and make a track, and he did so." " In the heel there was a rumple in the sock which caused it to make a V shape," and this peculiarity was noticeable in the tracks which had been made around Braswell's house. In this connection Hudson testified: " I went with Mr. Braswell at the time this man was arrested and saw him make a track. There was a crease in his sock that I particularly noticed was in the track that he made at Mr. Braswell's house. It was in a kind of V shape,— a wrinkle in the sock heel. That was the way that we identified the negro. . . We had the boy to take the shoe off the right foot. That was the track that had the peculiar crease in the sock heel. He had on common black looking socks and very dusty. The shoe we took off was unsound and ragged." There was further testimony to the effect that on the occasion just referred to the accused was asked "where he was the night before, and he said, in town, except about an hour and a half; that he brought Ralph Hutchins' daughters" home from a carnival which was being held in Macon, and about half past eleven came back to town and "was not in that neighborhood all that night." The accused was thereupon carried before the girls to whom he referred, and "they denied seeing him at all that night." At the trial one of them was introduced as a witness, and testified that she "did not come to the carnival," but remained at home, and "did not see the defendant at all that night."

From the foregoing it will be seen that the State established by direct and positive evidence that a burglary had been committed, as charged in the indictment, and also introduced testimony strongly pointing to the accused as the guilty person. The evidence bearing upon the question of identity was, it is true, purely circumstantial; but it was, in my opinion, sufficient to warrant a conviction. The trial judge, in charging the jury with regard to this branch of the case, fully and fairly instructed them as to the law of reasonable doubt, and carefully explained to them the nature of circumstantial evidence and how they were to weigh the same in arriving at their conclusion as to the guilt or innocence of the accused. The verdict not being without evidence to support it, and having met the approval of the presiding judge, I feel constrained to dissent from the judgment of my brethren setting it aside.